**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| J.R. SIMPLOT COMPANY, a Nevada corporation, | ) Case No.  CV 06-141-S-EJL |
| | ) |
| | ) **MEMORANDUM ORDER** |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| NESTLÉ USA, INC., a Delaware corporation, | ) |
| | ) |
| | ) |
| Defendant. | ) |

Pending before the Court in the above-entitled matter is Defendants motion for summary judgment and related motion to strike.  The parties have filed their responsive briefing and the matter is now ripe for the Court's review.  Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record.  Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this motion shall be decided on the record before this Court without oral argument.

### Factual and Procedural Background

Plaintiff, J.R. Simplot Company, Inc. ("Simplot"), initiated this lawsuit against the Defendant, Nestle USA, Inc. ("Nestle"), in the Fourth Judicial District for the state of Idaho.  The action was then removed to this Court.  (Dkt. No. 1).  Thereafter, Simplot filed a second amended complaint (Dkt. No. 39) raising claims for breach of contract as to the Distribution Agreement and the Asset Purchase Agreement, breach of the implied

**MEMORANDUM ORDER**  - 1

covenant of good faith and fair dealing, fraud, breach of fiduciary duty, negligent breach of fiduciary duty, and fraudulent concealment.[1]   Nestle filed the instant motion for summary judgment and answer to the second amended complaint (Dkt. Nos. 42, 68).   At issue in this case is the parties' dispute over the nature of their relationship involving the distribution and sale of dehydrated potato products as reflected by the written contracts executed by the parties entitled:   the Amended and Restated Purchase Agreement ("Purchase Agreement"), the Distribution Agreement, and the Asset Purchase Agreement.

Prior to 2000, Nestle was engaged in the business of manufacturing, distributing, and selling both frozen and dehydrated potato products.   The frozen products were produced at three separate processing plants, including a facility Nestle owned in Moses Lake, Washington.   Nestle manufactured a dehydrated potato product labeled "Trio" at only the Moses Lake plant.   Nestle also purchased a dehydrated potato product labeled "Idahoan" from a company called Idaho FreshPak, Inc. ("IFP").   IFP manufactured the Idahoan Products and sold them to Nestle for it to market and sell in the United States. In 2000, Nestle put its frozen and dehydrated potato business up for sale.

On July 28, 2000, Nestle and Simplot entered into the Purchase Agreement ("Purchase Agreement) whereby Simplot purchased the Moses Lake plant from Nestle. On October 2, 2000, the parties entered into the Distribution Agreement which established the parties relationship regarding the distribution of dehydrated potato products processed at the Moses Lake plant.   The Distribution Agreement provided for Simplot to produce and sell such products to Nestle sufficient to satisfy Nestle's

---

[1]  Simplot has dismissed counts four and six of the second amended complaint.  (Dkt. No. 52, p. 2).

**MEMORANDUM ORDER** - 2

requirements; Nestle would then distribute the products and the parties would divide the net profits.

On December 4, 2003, the parties executed the Asset Purchase Agreement whereby Simplot would purchase from Nestle all existing inventory and take over the operation of the dehydrated potato products venture. The closing date on this agreement was initially December 31, 2003 but later extended by the parties to June 30, 2004. Following the closing, profits failed to meet the levels previously enjoyed. Simplot argues the diminished profits were due to Nestle's trade loading and sales of excessive inventory to large customers thereby limiting Simplot's ability to sell inventory to those customers for a significant period of time following the closing. (Dkt. No. 39, ¶ 16). This conduct by Nestle, Simplot alleges, was in violation of the parties' agreements and constitutes breach. Nestle counters that it acted in accordance with its legal rights and performed in accordance with the terms of the contracts. (Dkt. No. 68, p. 7-10).

**Standard of Law**

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The Supreme Court has made it clear that under Rule 56 summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case and upon which the non-moving party will bear the burden of proof at trial. See Celotex Corp v.

**MEMORANDUM ORDER** - 3

Catrett, 477 U.S. 317, 322 (1986).  If the non-moving party fails to make such a showing on any essential element, "there can be no `genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.[2]

Moreover, under Rule 56, it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine."  An issue is "material" if it affects the outcome of the litigation.  An issue, before it may be considered "genuine," must be established by "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975) (quoting First Nat'l Bank v. Cities Serv. Co. Inc., 391 U.S. 253, 289 (1968)).  The Ninth Circuit cases are in accord.  See, e.g., British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund, 882 F.2d 371 (9th Cir. 1989).

According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

---

[2]  See also, Rule 56(e) which provides, in part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

**MEMORANDUM ORDER**  - 4

Id. at 374 (citation omitted).

Of course, when applying the above standard, the court must view all of the evidence in a light most favorable to the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Hughes v. United States, 953 F.2d 531, 541 (9th Cir. 1992).

## Discussion

I.   Counts One and Two: Breach of Contract - Distribution Agreement/Purchase Agreement

Nestle claims summary judgment is proper here because it has not breached any terms of any of the contracts between the parties.  In response, Simplot argues that Nestle has "missed the point" of its breach of contract claims and that it is "not alleging that conduct of Nestle violated express contract provisions.  Rather...that Nestle breached the parties' joint venture agreements by breaching the covenant of good faith and fair dealing and fiduciary duties owed to Simplot by robbing the business of its profitability and cash flow, thereby depriving Simplot of the benefits of its bargains, and by failing to timely disclose to Simplot major business decisions which negatively impacted the profitability of the business." (Dkt. No. 52, p. 27). Simplot's response concedes that it is not claiming Nestle breached an express term of the contracts but, instead that Nestle breached the implied covenant of good faith and fair dealing.  (Dkt. No. 52, p. 27).  The covenant, however, can not be the basis for a breach of contract claim.

"Under Delaware law, the elements of a breach of contract claim are:  1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."  H-M Wexford LLC v. Encorp, Inc., 832 A.2d 129, 140

(Del.Ch. 2003) (citation omitted).  Similarly in California, the "elements of a claim for breach of contract are: "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom."   Wall Street Network, Ltd. v. New York Times Co., 80 Cal.rptr.3d 6, 13 (Cal. App. 2008) (citation omitted).

It is true that a breach of the implied covenant of good faith and fair dealing, by itself, "will support a contract action" without any breach of a specific term of the contract.  Storek & Storek, Inc. v. Citicorp Real Estate, Inc., 122 Cal.Rptr.2d 267, 282-83 (Cal.App. 2002); see also Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 441-42 (Del. 2005) (describing the implied covenant as "a 'judicial convention designed to protect the spirit of the agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain.'").  However, Simplot has failed to provide any authority that a breach of the implied covenant of good faith and fair dealing can also be the basis for a separate breach of contract claim.  Because Simplot is not alleging any breach of any express contract term of either the Distribution Agreement or the Purchase Agreement, the motion for summary judgment is granted as to Counts One and Two.

II.     Remaining Claims

Simplot's theory of the case is that the parties were engaged in a joint venture beginning in July of 2000, when the parties negotiated the Purchase Agreement.  At that time, Simplot made its initial purchase offer to Nestle based upon the value of the on-going potato business and the assumption that Simplot would continue to sell dehydrated

potato products under both the Idahoan and Trio labels.[3]  (Dkt. No. 52, p. 4).  Simplot viewed the two products, Idahoan and Trio, as making up a complete dehydrated potato product line.   (Dkt. No. 52, pp. 4-5).   During the negotiations of the Purchase Agreement, Simplot's position was that "it could not preserve the profitability of a dehydrated potato product business without having control over both the essential Idahoan and Trio Product lines" and, therefore, it could not justify its initial purchase price "if it could not retain the profitability of the dehydrated potato business."  (Dkt. No. 52, p. 5) ("preserving the profit stream from the dehydrated potato business was vital to Simplot's willingness to buy the potato business" from Nestle for the initial purchase price and "without the Trio label and the Idahoan business, it could not replicate the profit stream....").   Because Nestle was "adamant" about retaining the initial purchase price, Simplot argues, "the parties agreed to enter into a joint venture where Simplot would take responsibility for manufacturing granule products with the Trio label and Nestle would take responsibility for marketing, selling and distributing both the Trio Products and the Idahoan Products, with the profits from the sales of both to be split between Nestle and Simplot."   (Dkt. No. 52, p. 5).   This understanding, Simplot argues, was formalized in Paragraph 6.9 of the Purchase Agreement and thereafter incorporated into the Distribution Agreement.

The Distribution Agreement, Simplot contends, was where "the parties formed their joint enterprise" with Simplot being required to produce for purchase and resale by Nestle the Trio Products and Nestle being given the exclusive right to distribute the Trio

---

[3]  Trio Products are a dehydrated granule commodity product marketed under the registered trademark "Trio" which were manufactured by Simplot at the Moses Lake processing plant.  The Idahoan Products were value-added dehydrated potato products produced by Idaho FreshPak, Inc. ("IFP") under the "Idahoan" label which is owned by IFP.  (Dkt. No. 52, p. 3).

**MEMORANDUM ORDER**  - 7

Products and the parties sharing in the profits from Nestle's sales of the Idahoan Products.  (Dkt. No. 52, p. 6).  Simplot maintains that "[t]here is no dispute that the primary purpose of the Distribution Agreement was to preserve and maximize the profitability of the dehydrated potato business" by giving both parties "some measure of ownership and control over the dehydrated potato business" in the form of "checks and balances."  (Dkt. No. 52, pp. 7-8).  Simplot further alleges that both parties viewed the relationship as a joint venture, pointing to writings and correspondence outside of the contracts.  In order for Simplot's claims to survive, there must be a joint venture that existed.[4]

A.    Contract Interpretation

To support its interpretation of the contracts, Simplot points to the written contracts themselves as well as other correspondence by the parties.  In particular, Simplot has offered the affidavit of James Munyon, Simplot's Food Group president, who negotiated the Distribution Agreement on Simplot's behalf.  (Dkt. No. 52, Aff. Munyon).  Mr. Munyon provides his understanding of the terms of the Distribution Agreement as creating a joint venture.   Simplot further asserts that "Nestle representatives also viewed the parties' relationship as a joint venture" pointing to certain written documents prepared by Nestle which, Simplot contends, referred to the business as the "potato joint venture."  (Dkt. No. 52, p. 5-7 and Dkt. No. 52-3, Statement of Disputed Facts, ¶ 33).  Nestle counters that Simplot cannot rely upon parol evidence

---

[4]  Count Five alleges breach of fiduciary duty by Nestle.  The source of these fiduciary duties is derived from the joint venture alleged by Simplot, not any expressed term of any of the contract provisions.  Count Seven alleges fraudulent concealment against Nestle in regards to its sale of product to a third-party, SYSCO, which Simplot argues was done in violation of a fiduciary duty owed to Simplot from Nestle.  As such, the question as to whether a joint venture exists is similarly dispositive of Counts Five and Seven.

**MEMORANDUM ORDER** - 8

to change the plain and unambiguous meaning of the contracts which, Nestle argues, do not support the finding of a joint venture.  (Dkt. No. 58, p. 26).

The Distribution Agreement is governed by Delaware law which directs that courts begin their construction of the contract by determining whether the contract clearly and accurately reflects the agreement of the parties.   Interim Healthcare, Inc. v. Spherion Corporation, 884 A.2d 513, 546 (Del.Super. Ct. 2005).  Ambiguity exists when the contract provisions in controversy "are reasonably or fairly susceptible of different interpretations or may have two or more different meanings ."  Id. (citation omitted).  If, after careful consideration, the court determines that the contract is a clear and accurate reflection of the parties' intended agreement, extrinsic evidence will not be considered and the interpretation is limited to the four corners of the contract.[5]  Id.  However, a contract is not rendered ambiguous simply because the parties disagree as to the meaning of its terms.  Id. at 547.  "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."  Lorillard Tobacco Co. v. American Legacy Found., 903 A.2d 728, 740 (Del. 2006) (citations omitted).  Ambiguity does arise, however, when the contract provisions in controversy "are reasonably or fairly susceptible of different interpretations or may have two or more different meanings ."  Id. (citation omitted).  "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."  Eagle Indus.,

---

[5]  The parol evidence rule requires that "[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing."  26 Corbin on Contracts § 573 (1960).

**MEMORANDUM ORDER**  - 9

Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. Supr. 1997) (citations omitted).

The Purchase Agreement is governed by California law which applies essentially the same rules for contract interpretation. See Wolf v. Walt Disney Pictures and Television, 76 Cal. Rptr.3d 585, 601-602 (Cal. App. 2008) (the "rules governing the role of the court in interpreting a written instrument are well established.").

> The interpretation of a contract is a judicial function. In engaging in this function, the trial court "give[s] effect to the mutual intention of the parties as it existed" at the time the contract was executed. Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms.
>
> The court generally may not consider extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract. Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous.

Id. (citations omitted).

The interpretation of a contract is a mixed question of law and fact. See O'Niell v. United States, 50 F.3d 677, 682 (9th Cir. 1995). Whether contract language is ambiguous is a question of law. See id. In examining the contracts at issue in this case, the Purchase Agreement, Distribution Agreement, and Asset Purchase Agreement, the Court finds the contracts each to be unambiguous. The parties are sophisticated businesses. The contracts themselves evidence that the parties undertook extensive negotiations in crafting the contracts. The terms expressed by the contracts are clear and are not subject to different interpretations by a reasonable person. Therefore, extrinsic evidence will not be considered to modify the terms of the contracts. The question then is whether the contracts created a joint venture.

**MEMORANDUM ORDER** - 10

B.    <u>Joint Venture</u>

The Distribution Agreement is governed by Delaware law.  Both parties have cited to <u>Warren v. Goldfinger Bros.</u>, 414 A.2d 507, 508 (Del. 1980) where the Delaware Supreme Court recognized that the existence of a joint venture "may be implied or proven by facts and circumstances showing that (a relationship of joint venture) was in fact entered into (citation omitted).  A joint adventure has been broadly defined as an enterprise undertaken by several persons jointly to carry out a single business enterprise, not amounting to a partnership, for their mutual benefit, in which they combine their property, money, effects, skill and knowledge.  The contribution of the parties need not necessarily be the same; one party may contribute land, another skill and experience, the third cash (citations omitted)."  <u>Id.</u> at 508-09 (quoting  <u>J. Leo Johnson, Inc. v. Carmer,</u> 156 A.2d 499, 502 (Del. Supr. 1959)).  The Delaware court went on to identify the elements of a joint venture as:  "(1) a community of interest in the performance of a common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits, (5) a duty to share in the losses which may be sustained."  <u>Id.</u> (citing <u>Kilgore Seed Co. v. Lewin</u>, 141 So.2d 809, 810-11 (Fla. App. 1962)).  The Court's determination as to the parties' relationship is "predominantly a factual one of applying the facts as found to criteria defining the differing legal relationships...."  <u>Warren</u>, 414 A.2d at 508; <u>see also</u> <u>J. Leo Johnson</u>, 156 A.2d at 502; <u>Quill v. Malizia</u>, No. 2239-S, 2005 WL 5755354, *12 n. 34 (Del.Ch. 2005) ("A joint venture may be established based on the facts and circumstances surrounding the parties' interactions....").

Nestle disagrees that the Distribution Agreement created a joint venture and argues, instead, that the parties' agreements evidence the fact that they are separate

entities engaged only in a business relationship.  Nestle contends the parties do not (1) own assets together, (2) have legal right to control the operations of the other, and/or (3) share losses.

1.    Jointly owned assets

Nestle argues that the contracts did not provide for any jointly owned assets between the parties.  Simplot counters that its purchase of the dehydrated foods business and the interrelation of the Trio trademarks and Idahoan products/label evidences that the parties had jointly owned assets.  Simplot argues the parties share a proprietary interest due to the interrelationship between Simplot's ownership of the granule dehydrated potato business, the licensing of the Trio label, the rights to sell and distribute the Idahoan Products, and the parties "ownership interest in the profits from the sale of the Trio and Idahoan Products."  (Dkt. No. 52, p. 19).

Simplot's argument that the parties jointly owned the profits from the sale of the Trio and Idahoan products is contrary to the language of the contracts.  However, the plain language of the contracts do not evidence any joint ownership of assets.  Though the contracts contained provisions regarding the Trio label and Idahoan products, there is nothing in the contracts evidencing a joint ownership by the two parties of any property or rights as to the Trio of Idahoan products.  Simplot purchased the dehydrated potato business in the Purchase Agreement.   Thereafter, the parties entered into contracts for the manufacturing and resale of those products subject to certain terms and conditions.  The two businesses remained separate entities having no joint assets, bank accounts, tax returns, employees, or facilities.  The contracts spelled out how the profits would be divided between the two businesses with each having certain rights to a specified percentage of the profits, not joint ownership.

**MEMORANDUM ORDER**  - 12

2.      Ability to Control of Operations of the Other

Nestle points to ¶ 7 of the Distribution Agreement arguing "Nestle had no legal right to control Simplot in its manufacturing operations, and Simplot had no legal right to control Nestle in its marketing, sales, and distribution of dehydrated potato products." (Dkt. No. 58, p. 19).  In response, Simplot argues the Distribution Agreement provides for "checks and balances" between the parties which amounts to control.  Simplot contends the parties were "partners in Nestle's food service business...[and] [j]ust because Simplot delegated primary responsibility for managing marketing, sales and distribution to Nestle...does not mean that Simplot relinquished all control to Nestle over those aspects of the business.  The expectation of the parties was clearly to cooperate in good faith to maximize profits of the business, and to consult with one another on all major issues and decisions affecting the business's profitability, regardless [of] whether such decision involved sales, distribution or manufacturing issues."  (Dkt. No. 52, p. 22).  Further, Simplot argues the parties conduct under the contracts evidences  that they exercised some measure of oversight and control over the operations of one another.  (Dkt. No. 52, p. 23).  Pointing to the fact that the parties met regularly to discuss and share information, prepare and analyze the six-month profit and loss statements, and making joint business calls.  Simplot alternatively argues disputed material facts preclude a determination of whether the parties had a mutual right of control sufficient to create a joint venture.  (Dkt. No. 52, p. 21).  Simplot contends that the "concept of control ... is very flexible and does not have a fixed or certain boundary, depending instead on the facts of a particular case."  (Dkt. No. 52, p. 21) (citing Sheppard v. Carey, 254 A.2d 260, 262-63 (Del.Ch. 1969)).   Simplot's interpretation,

**MEMORANDUM ORDER**  - 13

however, does not square with the plain and express language of the contract.  Paragraph

7 of the Distribution Agreement states:

> Nestle's relationship with Simplot is that of an independent contractor.
> Nothing in this Agreement shall be deemed to create an agency or
> employee relationship between the parties, and no such relationship
> presently exists between them.  Each party shall take such steps, do such
> things, hire and direct such personnel, as may be necessary to enable it to
> perform its obligations hereunder.  Neither party shall have any control
> over the details or the manner of the other's performance of its obligations
> hereunder, except as specified in this Agreement.

Simplot disputes that this provision controls and points to the fact that Paragraph 7 also

allows the parties to "control the details or manner of each other's performance 'as

specified in this Agreement.'" (Dkt. No. 52, p. 24).   Further, Simplot argues this

provision does not control the question of whether a joint venture exists.   While the

Court agrees that this single provision alone is not dispositive of the question, it

supports the conclusion that the terms of the Distribution Agreement do not allow for

the parties to share joint control.  The "checks and balances" pointed to by Simplot to

support its contention are normal review rights and duties of each party to assure itself

that the terms of the contract were being met such as:  auditing the books of the other,

requiring regular statements and forecasts, along with periodic meetings.  These terms

of the contracts, however, do not give way to any legal right of either party to control

the operations or assets of the other.  Instead, they merely provide a means for each of

the businesses to assure they were each receiving that which they were entitled to under

the agreements.  Each business made its own decisions and exercised control over its

own business; there was no ability of either to control the other.

**MEMORANDUM ORDER**  - 14

3.     <u>Sharing Losses</u>

Again pointing to the Distribution Agreement, Nestle argues that Simplot had no duty to share in losses.  Paragraph 3 of the Distribution Agreement, Nestle asserts, requires Nestle to pay Simplot in full for all of its costs at all times and, thus, Simplot was entitled only to share in the net profits from Nestle's resale of the dehydrated potato products but there is no contract term imposing a duty upon Simplot to share in any losses.  (Dkt. No. 58, p. 28).

Simplot argues that an express provision for the sharing of losses is not required.  (Dkt. No. 52, p. 19).   In support of this proposition, Simplot cites to cases from California, Idaho, Utah, and  51 A.L.R.4th 371.  In Delaware, the duty to share in losses is an element required for a joint venture.  <u>See</u> <u>Warren</u>, 414 A.2d at 509.  Though some jurisdictions may imply an agreement to share losses, that is not the case here.  <u>See</u> <u>46 Am.Jur.2d Joint Ventures</u> § 67 (Sept. 2008).  Simplot points to the Distribution Agreement's definition of "dehydrated profits" to be net revenue minus costs which would result in losses where the allowable costs exceed the net revenue.  (Dkt. No. 52, p. 21).  Simplot also points to the June 30, 2004 statement from Nestle which reported a loss and argues that Nestle sent a demand for reimbursement to Simplot for the loss.  This evidence goes to the parties course of performance and may be properly considered.  On this point, the Court finds genuine issues of material fact exist as to whether the parties shared in the losses.  However, because Simplot has failed to demonstrate joint ownership of assets or ability to control the other party, it has failed to provide facts to support its claim of a joint venture regardless of whether the parties shared in losses.

4.    <u>Conclusion</u>

The contracts define the business dealings of the parties over the course of a few years.  The parties were engaged in an on-going business relationship involving the manufacturing, producing, and selling of potato products for profit.  However, the fact that two business entities entered into a contractual relationship with one another and both obviously desired to profit from the relationship does not evidence a joint venture. Just the opposite is true in this case.  The language of the contracts has the effect of maintaining the separateness of the two businesses.  Each party has separate rights and duties owed to and from the other party.  The "checks and balances," referred to by Simplot, are reciprocating duties and rights commonly seen in business contracts.  The fact that each party had to give and take under the contract goes to show that they were not on the same team, as with a joint venture, but instead on opposing sides of a teeter-totter seeking to strike a profitable balance for both businesses.  The parties were not able to control the actions of the other that may have thrown off the balance between the two.  Each acted independently.  There were no jointly owned assets and neither party had the right or ability to control the policies or conduct of the other.  Further, the profit sharing scheme did not expressly require the sharing of losses, however, there is a disputed question of material fact as to this element.

Simplot's contract interpretation points only to its own interests and concerns. Mainly, the retaining of the dehydrated potato products profit stream by assuring the continuation of the sales of both the Trio label and Idahoan products.  Noticeably absent from this argument are the interests and concerns of Nestle.  This omission in Simplot's contract interpretation weighs against finding the existence of a joint venture.  The parties did not have a unified purpose but instead remained separate business entities

**MEMORANDUM ORDER**  - 16

engaged in an ongoing business relationship.  Because the unambiguous contract terms evidence no joint ownership of assets or control, the Court concludes that there was no joint venture between the parties in this case.

Simplot also argues that the "joint venture imposed certain obligations on the parties in addition to those provided by their written agreements, and such obligations were not negated by those agreements."  (Dkt. No. 52, p. 16).  However, Simplot cannot invoke the implied covenant where the parties have a written contract expressly covering the terms or issue allegedly breached or violated.  Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1032-33 (Del. Ch. 2006) (citing Shenandoah Life Ins. Co. v. Valero Energy Corp., 1988 WL 63491, at *8 (Del. Ch. 1988) (noting that where "a specific, negotiated provision directly treats the subject of the alleged wrong and has been found to have not been violated, it is quite unlikely that a court will find by implication a contractual obligation of a different kind that has been breached")); see also Storek & Storek, Inc. v. Citicorp Real Estate, Inc. 100 Cal.App.4th 44, 55 (Cal.App. 2002) ( "an implied covenant of good faith and fair dealing cannot contradict the express terms of a contract.").  The contracts between Nestle and Simplot do not support finding the existence or formation of a joint venture.  Further, the express terms of the contracts control.  As such, Simplot's theory of the case and all of the claims upon which it is based fail as a matter of law and the motion for summary judgment is proper.

C.    Count Three:  Breach of the Implied Covenant of Good Faith and Fair Dealing

Count Three of the second amended complaint alleges:

Nestle was contractually obligated to deal with Simplot and conduct the Business honestly and with the observance of reasonable commercial standards of fair dealing in the trade...to refrain from engaging in any

conduct that was inconsistent with the parties' legitimate expectations, was objectively unreasonable, or violated nullified or significantly impaired Simplot's rights and obligations under the terms of the parties' agreements.

Nestle's wrongful conduct of the Business...included engaging in the practice of excessive "trade loading" and its providing unjustifiable cost reductions to certain customers during the six month period ending June 30, 2004...constituted a breach of the implied covenants of good faith and fair dealing contained within the parties' agreements.

(Dkt. No. 39, p. 8).[6]  This claim is centered around the last six months before Nestle exited the dehydrated potato products business and Nestle's dealings with Sysco.  In the spring of 2003, Simplot argues Nestle gave customer discounts and engaged in trade loading, primarily to Sysco, that Simplot maintains negatively impacted its profitability and eventually resulted in Simplot losing Sysco's business.  (Dkt. No. 52, pp. 34-35).

Nestle argues it did not breach the implied covenant of good faith and fair dealing as to the Asset Purchase Agreement which provided for the sale of four assets from Nestle to Simplot and the agreement as to the limited license for Simplot to use the Trio trademark.   (Dkt. No. 58, p. 15-16).   Nestle points out that the Asset Purchase Agreement is "silent" as to any of Simplot's arguments regarding "trade loading" or "customer discounts" as these matters are addressed by the Distribution Agreement. (Dkt. No. 58, p. 16).  Because Nestle performed all of its obligations under the Asset Purchase Agreement, it argues, summary judgment is proper.  As to the Distribution Agreement, Nestle argues it did not breach the implied covenant because the express terms of the contract allowed Nestle to give customer discounts, promotions, and incentives.

---

[6]  The second amended complaint uses the term "the Business" as being the "joint efforts of Simplot and Nestle in the distribution of dehydrated potato products processed at the Moses Lake plant purchased from Nestle by Simplot ... and the sharing of profits and losses regarding the same."  (Dkt. No. 39, p. 3).

**MEMORANDUM ORDER**  - 18

As stated above, Simplot cannot invoke the implied covenant where the parties have a written contract expressly covering the terms or issue allegedly breached or violated. Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1032-33 (Del. Ch. 2006) (citing Shenandoah Life Ins. Co. v. Valero Energy Corp., 1988 WL 63491, at *8 (Del. Ch. 1988) (noting that where "a specific, negotiated provision directly treats the subject of the alleged wrong and has been found to have not been violated, it is quite unlikely that a court will find by implication a contractual obligation of a different kind that has been breached")); see also Storek & Storek, Inc. v. Citicorp Real Estate, Inc. 100 Cal.App.4th 44, 55 (Cal.App. 2002) ( "an implied covenant of good faith and fair dealing cannot contradict the express terms of a contract."). Summary judgment is appropriate on this claim because the actions allegedly making up the breaches of the implied covenant are covered by the express terms of the contracts.

The terms of the Asset Purchase Agreement provided for Nestle's withdraw from the dehydrated potato products business by way of the sale of four of Nestle's assets to Simplot in addition to the limited license to use the Trio trademark. The Asset Purchase Agreement did not address the manner in which Nestle was to distribute the dehydrated potato products. The parties' agreement as to the distribution of the products by Nestle was encompassed in the Distribution Agreement. Paragraph 5 of the Distribution Agreement allowed for Nestle to control the marketing, sale, and distribution of dehydrated potato products under the contract and provided for the profit sharing structure between the parties. Simplot acknowledges that it "delegated primary responsibility for managing marketing, sales and distribution to Nestle...." (Dkt. No. 52, p. 22). As such, Nestle acted in accordance with its obligations and rights under the express terms of the contracts and, in doing so, did not violate the implied covenant.

**MEMORANDUM ORDER** - 19

The real basis for Simplot's breach of the implied covenant claim is its allegation that Nestle breached the implied covenant as to the joint venture that Simplot argues existed.  Contending that Nestle "breached the covenant of good faith and fair dealing, and therefore the joint venture contracts between the parties."  (Dkt. No. 52, p. 35); see also (Dkt. No. 52, p. 22) ("The expectation of the parties was clearly to cooperate in good faith to maximize profits of the business, and to consult with one another on all major issues and decisions affecting the business's profitability, regardless [of] whether such decision involved sales, distribution or manufacturing issues.").  Nestle argues that neither the Asset Purchase Agreement nor the Distribution Agreement created a joint venture.[7]  (Dkt. No. 58, p. 33).  Because the Court has determined above that no joint venture was created, there is no claim for breach of the implied covenant based on any joint venture.

## III.    Motion to Strike

Simplot has filed a motion to strike the affidavit of John O. Murphy or, alternatively, to strike inadmissable portions of the affidavit including the attached exhibits.  The motion is made pursuant to Federal Rule of Civil Procedure 56(e). Simplot argues Mr. Murphy has "no personal knowledge of the matters contained in the voluminous attachments to his Affidavit, and has made no showing that he is competent

---

[7]  The Asset Purchase Agreement is governed by California law which employ similar standards for determining the existence of a joint venture as Delaware.  "A joint venture is an undertaking by two or more persons jointly to carry out a single business enterprise for profit.   Weiner v. Fleischman, 816 P.2d 892, 895 (Cal. 1991) (citation omitted).  "Like partners, joint venturers are fiduciaries with a duty of disclosure and liability to account for profits."  "The elements necessary for the creation of a joint venture are: (1) joint interest in a common business; (2) with an understanding to share profits and losses; and (3) a right to joint control."  April Enterprises, Inc. v. KTTV, 147 Cal.App.3d 805, 819 (Cal.App. 1983) (citation omitted); see also Scottsdale Ins. Co. v. Essex Ins. Co., 98 Cal. App.4th 86, 91 (Cal. App. 2002) (quoting Orosco v. Sun-Diamond Corp., 51 Cal.App.4th 1659, 1666 (1997) ("There are three basic elements of a joint venture: the members must have joint control over the venture (even though they may delegate it), they must share the profits of the undertaking, and the members must each have an ownership interest in the enterprise.").  "An agreement to 'go into business' of itself does not imply a joint venture or any specific type of operation."  Myers v. Gager, 346 P.2d 251, 255 (Cal.App. 1959) (citation omitted).

**MEMORANDUM ORDER**  - 20

to testify...as to those matters" or that he is "able to provide the necessary foundation for their admissibility" and because numerous statements in the affidavit contradict Mr. Murphy's prior deposition testimony.   (Dkt. No. 54, pp. 1-2).   Nestle claims the foundation is proper because Mr. Murphy gained personal knowledge of the facts set forth in the affidavit by reviewing Nestle's business records.  (Dkt. No. 61).  Simplot rebuts contending that the statements are inadmissible hearsay, conclusions, and violate the best evidence rule.   (Dkt. No. 64).   Because the Court did not rely upon Mr. Murphy's affidavit in ruling on this motion, the motion to strike is moot.

## ORDER

Based on the foregoing, the Court HEREBY ORDERS as follows:

1)    Defendant's Motion for Summary Judgment (Dkt. No. 42) is **GRANTED**.

2)    Plaintiff's Motion to Strike (Dkt. No. 54) is **MOOT**.

DATED:  **March 4, 2009**

Honorable Edward J. Lodge
U. S. District Judge

**MEMORANDUM ORDER**  - 21